# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )        Case No.   '21 MJ03769
Facebook account username "Triny Barajas", Facebook )
user ID number: 100001430933149 )
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 952, 960 | Importation of Controlled Substances |
| 21 U.S.C. Sections 963 | Conspiracy to Import Controlled Substances |

The application is based on these facts:
See attached affidavit

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

*Russell Slingerland Jr.*
Applicant's signature

Russell Slingerland Jr.
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone__ *(specify reliable electronic means)*.

*Daniel E. Butcher*
Judge's signature

Date: 09/13/2021

City and state: _____        Hon. Daniel E. Butcher
Printed name and title

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

    a.    Facebook account with username "Triny Barajas", Facebook user ID number: 100001430933149, link: https://www.facebook.com/profile.php?id=100001430933149 (hereinafter referred to as the **Subject Account**), believed to be used by Maria Trinidad BARAJAS de Medina (8/8/1971).

The **Subject Account** is currently in the possession of Facebook, Inc., an Internet service provider with its primary computer information systems and other electronic communications and storage systems, records and data located at Facebook, Inc., Attn: Security Department/Custodian of Records, 1601 California Avenue, Palo Alto, CA 94304.

# ATTACHMENT B

ITEMS TO BE SEIZED

**I.      Service of Warrant**

The officer executing the warrant shall permit Facebook, Inc. as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.     Items to be provided by the ISP**

All subscriber and/or user information including basic subscriber information (referred to as Neoselect), all electronic mail, images, comments associated with images, text/wall messages, histories, friend lists, profiles, method of payment, detailed billing records, access logs, Expanded Subscriber Content (referred to as Neoprint) including profile contact information, mini-feed, status update history, shares, notes, wall postings, friend listing with friend's Facebook ID, group listing with Facebook Group ID, future and past events, and video listings with filename; User Photos (referred to as User Photoprint); Group Information; Private Messages; IP Logs and any other files associated with the following Facebook accounts and pages:

a.      Facebook account with username "Triny Barajas", Facebook user ID number: 100001430933149, link: https://www.facebook.com/profile.php?id=100001430933149 (hereinafter referred to as the **Subject Account**), believed to be used by Maria Trinidad BARAJAS de Medina (8/8/1971).

**III.    The search of the data supplied by the ISP pursuant to this warrant will be conducted by HSI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of October 14, 2020 to January 14, 2021, and the seizure of:**

a.      All contact and personal identifying information for the **Subject Account**, including full name, user identification number, birth date, gender, contact e-mail

addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

  b. Communications, records, and attachments or electronic mail, text or instant messages, posts, profiles information, and attachments tending to discuss or establish drug trafficking, sales, importation;

  c. Communications, records, and attachments or electronic mail and attachments tending to establish the identities of any co-conspirators; and

  d. Communications, records, and attachments or electronic mail and attachments that provide context to any electronic mail reflecting the criminal activity described in this warrant including any electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail that identifies any users of the **Subject Account**;

which are evidence of Importation and Conspiracy to Import Methamphetamine in violation of Title 21, United States Code, Sections 952, 960, and 963.

# AFFIDAVIT

I, Special Agent Russell Slingerland Jr., having been duly sworn do hereby state that the following is true to my knowledge and belief.

A.   **Introduction**

1. I make this affidavit in support of one application for a search warrant in furtherance of a narcotics smuggling investigation conducted by Homeland Security Investigations ("HSI") agents for the following Facebook Account located as described in Attachment A (incorporated herein):

> Facebook account with username "Triny Barajas"; Facebook user ID number: 100001430933149; link:
> https://www.facebook.com/profile.php?id=100001430933149

(hereinafter, "Subject Account") believed to be used by Maria Trinidad BARAJAS de Medina, ("BARAJAS") from October 14, 2020 to January 14, 2021, for items that constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 952, 960, 963, Importation of Controlled Substances and Conspiracy, as described in Attachment B.

B.   **Training and Experience**

2. I am a Special Agent and currently employed with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3. I have held my current position with HSI since December of 2016. I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training Program at the Federal Law Enforcement Training Center (FLETC). During the course of my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence,

preservation of a crime scene, and use of electronic evidence--all in relation to violations of the United States Code.

4. From November 2003 to December 2016, I worked at DHS, Customs and Border Protection, United States Border Patrol (USBP) as a Border Patrol Agent. I was employed as a full-time, sworn federal agent with the USBP. I graduated from the USBP Basic Border Patrol Training Academy located in Charleston, South Carolina. While employed with the USBP, I held the position of a Patrol Agent, Canine Handler, Canine Instructor, and Supervisory Border Patrol Agent.

5. Currently, I am assigned to the HSI Weapons and Gangs Group in San Ysidro, California. I am also assigned to the United States Marshals Service Fugitive Task Force, where I hold a special deputation as a Special Deputy United States Marshal and Task Force Officer. I investigate violations of the United States Code that stem from the international border between Mexico and the United States, including drug smuggling, as well as conducting fugitive operations. I have participated in investigating various drug trafficking organizations that are involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. I have spoken with other agents with extensive experience in narcotics smuggling investigations. Through my experience and training, I have gained a working knowledge and insight into the normal operational habits of narcotics smugglers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego International Ports of Entry.

6. As a Special Agent with HSI, my duties include the investigation of narcotics-related violations of Title 21 of the United States Code and the California Health and Safety Code. I have participated in and conducted numerous investigations of violations of various State and Federal criminal laws, including distribution of controlled substances, use of a communication facilities to commit narcotic offenses, importation of controlled substances, conspiracy to import, possess and distribute controlled substances, all in

violation of Title 21 and Title 18, United States Code and various California Health and Safety Code and California Penal Code sections. These investigations resulted in arrests of individuals who have imported, smuggled, received and distributed controlled substances, including methamphetamine, marijuana, heroin, and methamphetamine. Also, these investigations resulted in seizures of illegal drugs and proceeds from the distribution of those illegal drugs. Through these investigations and training, I am familiar with the operations of illegal international Drug Trafficking Organizations (DTOs) in various parts of the world, specifically Mexico.

7. Based on my training and experience, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I have become knowledgeable of the methods and modes of narcotics operations and the language and patterns of narcotics abuse and trafficking. I have become familiar with the methods of operation typically used by narcotics traffickers. I am aware that it is a common practice for drug traffickers to work in concert with other individuals and to do so by utilizing cellular telephones and web based messaging and communication programs such as Facebook Messenger and WhatsApp to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as text messages, photos and voicemail messages referring to the arrangements of travel and payment, names, and phone numbers of co-conspirators.

8. Moreover, I know that narcotics operations depend upon maintaining their extensive contacts. The use of web based messaging and communication programs such as Facebook Messenger are essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers.

These communication programs allow narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

9. Based on my training and experience as a Special Agent and in consultation with law enforcement officers experienced in narcotics smuggling investigations, and all of the facts and opinions set forth in this affidavit, I am aware that:

   a. Drug smugglers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;
   b. Drug smugglers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;
   c. Drug smugglers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;
   d. Drug smugglers will use social networking and messaging services to direct drivers to synchronize an exact drop-off and/or pick up time of their illegal cargo;
   e. Drug smugglers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and
   f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

10. The following is based on my own investigation, oral and written reports by other law enforcement officers, interviews, subpoenaed and public records, database checks, and other investigations. Because this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to

establish foundation for the requested search warrant application. Conversations and discussions below are set forth in substance unless noted. Dates and times are approximate.

## C. Facts in Support of Probable Cause

11. On January 14, 2021, at approximately 3:45 AM, BARAJAS, a United States citizen, applied for entry into the United States from Mexico through the San Ysidro Port of Entry in vehicle lane number 5. BARAJAS was the driver, sole occupant, and registered owner of a 2008 Nissan Rogue ("the vehicle") bearing California license plates.

12. A Customs and Border Protection Officer ("CBPO") received two negative Customs declarations from BARAJAS. BARAJAS stated she was crossing the border to go to Chula Vista, California. The inspecting CBPO noticed irregular mannerisms and body language from BARAJAS and located a blue duffel bag in the cargo area of the vehicle. Inside the blue duffel bag, the inspecting CBPO discovered plastic wrapped packages of suspected controlled substances.

13. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the duffel bag inside of the vehicle.

14. The blue duffel bag located in the cargo area of the vehicle was found to contain 22 plastic wrapped packages, with a total approximate weight of 19.94 kilograms (43.96 pounds). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

15. BARAJAS was placed under arrest at approximately 5:30 AM and charged with a violation of Title 21, United States Code, Sections 952 and 960, importation of a controlled substance.

16. Defendant's pink iPhone (Seizure No. 2021250400099101-0005) was found and seized by a Customs and Border Protection Officer (CBPO) who was tasked to perform a secondary inspection of the vehicle and inventory all the property seized from the Defendant and her vehicle. BARAJAS identified the pink iPhone as hers during an interview.

17.     Law enforcement obtained an extraction of Defendant's pink iPhone seized during her arrest using Cellebrite digital intelligence platform pursuant to an initial search warrant issued on March 10, 2021, by United States Magistrate Judge Daniel Butcher. Law enforcement obtained an extraction of Defendant's iPhone seized during her arrest using a different platform pursuant to a second search warrant issued on July 26, 2021, by United Stated Magistrate Judge Michael S. Berg.

18.     The extractions contained what appear to be cached photographs from the Subject Account accessed approximately within a week of her arrest, including, but not limited to, images of vehicle keys, a SENTRI card for an unidentified female, a Mexican passport of a Salvador Mejia Nunez, and a California identification card for Elizabeth Mendoza. The extractions also contained what appear to be approximately 51 Facebook messenger conversations with approximately 1,978 messages exchanged between the Subject Account and accounts. Many of the conversations appear to show that attachments, such as .jpeg or .png images or .mp4 videos, were sent or received but images or videos were unable to be viewed in the extracted conversations.

19.     Based upon my experience and investigation in this case and in other cases, I believe that information relevant to the narcotic smuggling activities of BARAJAS and co-conspirators, such as telephone numbers, incoming and outgoing calls, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the Facebook account described herein. Furthermore, I believe that BARAJAS may have discussed details associated to narcotic smuggling offenses and/or the images referenced above with multiple individuals through Facebook chat media. I also know that chat messages, contact names, addresses, appointment dates, pictures and other digital information are stored on Facebook.com which may identify other persons involved in narcotic smuggling activities.

20.     The search warrant is limited to October 14, 2020, to the date of Defendant's arrest on January 14, 2021. In my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the weeks and

months prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.  Additionally, based on Records reflect that Defendant had crossed the vehicle into the United States from Mexico approximately 50 times between October 16, 2020 and the date of her arrest on January 14, 2020.  Accordingly, I request permission to search for data from October 14, 2020, to the date of Defendant's arrest on January 14, 2021.

**D.     Genuine Risks of Destruction of Evidence**

21.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

**E.     Prior Attempts to Obtain This Evidence**

22.    As specified above, the first and second extractions of Defendant's pink iPhone pursuant to search warrants contained some information from the Subject Account, as specified above, but did not provide a complete download of the Subject Account during the time period requested by this warrant.

**F.     Social Network Provider**

23.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

24. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

25. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

26. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

27. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and

guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

28.  Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

29.  Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

30.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

31.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

32. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

33. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

34. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

35. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

36. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

37. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

39.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

40.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

G.      **Procedures for Electronically Stored Information**

42.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Facebook are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to

11

analyze the contents of those accounts on the premises of Facebook. The impact on the Facebook's business would be severe.

43. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the Facebook accounts, as described in Attachment A. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachments B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

44. Analyzing the data to be provided by Facebook requires special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

45. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the

investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

46.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages/comments/entries that identify any users of the subject account(s) and any electronic communications sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

47.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## H.  Conclusion

48.  Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitution evidence, fruits, and instrumentalities of violations of Title 21, United States Code, United States Code, Sections 952, 960, 963, Importation of Controlled Substances and Conspiracy, as described in Attachment B, and will be found at the premises to be searched as provided in Attachment A.

//
//
//
//
//
//
//
//
//
//
//
//

WHEREFORE, I request that this Court issue a warrant authorizing HSI Special Agents and/or other federal and state law enforcement officers to search the property in Attachment A and to seize items listed in Attachment B, using the methodology described above.

*Russell Slingerland Jr.*
Russell Slingerland Jr.
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this ___13th___ day of September, 2021.

*Daniel E. Butcher*
HON. DANIEL E. BUTCHER
U.S. MAGISTRATE JUDGE